# Federal Defenders
OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor, New York, NY 10007
Tel: (212) 417-8700  Fax: (212) 658-9483

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

January 9, 2025

**BY ECF**

The Honorable Naomi Reice Buchwald
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:     **United States v. Sarah Valerio Pujols**
        **24 Cr. 442 (NRB)**

Honorable Judge Buchwald:

     Sarah Valerio Pujols is the pillar for her family and community.  As the thirty-four strong letters of support submitted on her behalf explain, Ms. Valerio has supported her family emotionally and financially as her mother's home health aide and as her four-year-old son's primary caretaker.  When her siblings left the New York area, Ms. Valerio chose to remain to make sure her mother had adequate care and support for day-to-day tasks, which she could not complete on her own due to her debilitating arthritis.  Both friends and family have relied upon Ms. Valerio for support and care.  In fact, one would be hard-pressed to find anyone whom Ms. Valerio has ever turned away.

     Now, full of remorse, Ms. Valerio recognizes there was one person he should have denied help to: her childhood friend, who asked for Ms. Valerio's help to bring money to his father and uncle in the Dominican Republic. Knowing that Ms. Valerio had been struggling with fertility issues for years and the financial burdens of her fertility treatments, her friend offered her the opportunity to make extra money to do this favor.  Ms. Valerio realizes that, through her senseless actions, she has placed not only her own dreams and goals at risk, but also jeopardized the dreams of her now four-year-old son that she worked so incredibly hard to conceive. Provided the Court's sentence permits Ms. Valerio to remain at liberty, Ms. Valerio will continue working in the same way she always has for her family: tirelessly. But one thing will have changed for Ms. Valerio. She will have learned, painfully, that he can no longer give herself unquestioningly to just any request from close friends or family no matter how dire her personal circumstances are.

     Since her criminal conduct, which ended over five years ago, Ms. Valerio has given birth to her son, has worked steadily to support her family, and has lived a law-abiding life. Even upon the shock of her arrest, nearly five years later, Ms. Valerio has kept her composure and remained

fully compliant with pre-trial services. Now, Ms. Valerio stands before this Court having accepted responsibility for her actions and having pled guilty quickly, forgoing the right and opportunity to even receive or review discovery in her case.

I write to respectfully request that the Court sentence Ms. Valerio – a zero-point offender – to time served and a term of supervised release, six months of which in home incarceration. Three factors call for this sentence. First, although Ms. Valerio's offense is serious, her actions are aberrational in nature as they were fueled by the desperation and the financial burdens caused by her attempts to conceive a child through fertility treatments. Second, a noncustodial sentence would properly account for Ms. Valerio's low recidivism and rehabilitation as demonstrated by the fact that she has lived a law-abiding life since 2019 – four years before her arrest in the instant matter. Third, the collateral consequences of any period of imprisonment would be severe, including abandoning her young son as she is the primary parent and losing the opportunity to begin employment at her new job as a Spanish Bilingual Customer Service Representative at CVS Health.  Given these factors, a noncustodial sentence is "sufficient but not greater than necessary" to achieve the goals of sentencing in this case. 18 U.S.C. § 3553.

## Background

Sarah Valerio Pujols was born on June 28, 1981 in Santo Domingo, Dominican Republic to Manuel Valerio and Alicia Pujols.  The youngest of her parent's five children, Ms. Valerio arrived in the United States with her siblings and her mother when she was six years old and settled in the Bronx, New York with the hopes of better opportunities here.  Upon arriving, Ms. Valerio's mother felt the immediate financial and cultural strain of living in New York and raising five children alone without speaking English.  That said, Ms. Valerio felt lucky to have moved to the Bronx into her uncle's building as she could now see her extended family daily. The presence of Ms. Valerio's extended family was critical to her upbringing as her mother, who worked nights packaging at a candy factory, was struggling to meet the family's financial needs as they were living paycheck to paycheck.  Indeed, while her mother would be away working nights, Ms. Valerio's aunts and uncles would step in to care for her and her siblings.

Eventually, Ms. Valerio's father also immigrated to the Bronx from the Dominican Republic.  His arrival, although welcomed, did not provide the financial relief Ms. Valerio's mother hoped it would.  Rather, Mr. Valerio, who worked as a photographer in the Dominican Republic, did not find work for some time in New York and, thus, was not contributing financially to the household.  This tension caused a rift between Ms. Valerio's parents, leading to their separation when Ms. Valerio was in middle school.  Fortunately, her father did not move far, but rather into a basement apartment in the same building and remained present in Ms. Valerio's daily life.  After the separation, Mr. Valerio found work as a factory worker at a plastics manufacturing company, but he still did not financially assist his estranged wife.  As such, Ms. Valerio's mother struggled to provide the basics for her children and often relied upon church members and even Ms. Valerio's teachers to provide, hand-me-down clothing and food to survive.

Hoping to relive some of the financial pressure from her mother, Ms. Valerio began working jobs while maintaining a rigorous academic schedule in high school.  Indeed, Ms. Valerio always remained attentive to her studies and completed various AP classes at Richard R.

Green High School in Manhattan.  Upon graduating in 2001, Ms. Valerio began studying marketing at Bronx County Community College.  Although Ms. Valerio wanted to continue her studies, Ms. Valerio was forced to leave college and join the labor force full time to financially assist her mother, whom she continued to reside with.

In 2010, Ms. Valerio met her now husband, Eddy Perez, through a mutual friend.  Ms. Valerio and Mr. Perez, who had two sons from prior relationships, aged eight and six at the time, quickly took to one another and became inseparable.  As Madeline Abreu, Mr. Perez's ex-wife writes, Ms. Valerio has always maintained a close relationship with her and her son: "My son met Sarah when he was eight years old and each time, he came from a visit with his father he was happy.  More than once he mentioned that he loved her and enjoyed spending time with them.  He still holds the same regard for her to this day." Letters of Support, attached as Exhibit B, at 24.  As Ms. Valerio's family and friends explain in their letters, Ms. Valerio has always been had a naturally maternal figure for children and, having come from a big family, she looked forward to having many children of her own.  See Sarah Valerio's Letter to the Court, attached as Exhibit A at 1.

In 2011, the couple began trying to conceive a child of their own and later married in 2016.  After years of trying to conceive, it became clear, however, that they were going to need medical intervention if they wanted children.  This was particularly devastating for Ms. Valerio as, culturally, there was an expectation that she conceive children quickly in her community, causing deep shame and embarrassment for Ms. Valerio.  Moreover, Ms. Valerio and Mr. Perez were deeply concerned about the financial ramifications medically induced pregnancy would have on them.  Over the next few years, Ms. Valerio had several tests, bloodwork, and operations to address her fertility issues, including a surgery to remove a blockage from her fallopian tubes.  Once the blockage was removed, Ms. Valerio underwent two intrauterine insemination procedures (IUIs).  This process was psychologically, financially, and emotionally damaging to Ms. Valerio.  As she describes in her letter,

> The emotional turmoil of these procedures and my fertility issues took a significant toll on both my mental health and physical well-being. I was at appointments, driving from the Bronx to Long Island, almost every day—I even had to take time off from my job to fit it all in my schedule. Even though I had health insurance, the IUI procedures and fertility treatments I was receiving were very expensive and not fully covered. My husband and I couldn't afford to continue paying for these medical bills with our income, so I needed extra money.

Ex. A at 1.

## Instant Offense

While Ms. Valerio was facing mounting financial debts from fertility procedures, she relied upon a longtime childhood friend for emotional support.  As Ms. Valerio described him, "he was family" – "a brother."  Ex. A at 2.  More than anyone else, he knew the vulnerability

around Ms. Valerio's fertility struggles as he even attended her fist IUI procedure.  Ex. A at 1-2.
Knowing the financial burdens Ms. Valerio was facing, he proposed a way for Ms. Valerio to
make money to help fund the fertility treatments.  Specifically, he suggested that Ms. Valerio
bring money to the Dominican Republic for him and drop it off with his father or uncle, whom
she had also known since childhood, upon her arrival.

On December 20, 2019, Ms. Pujols, while working for an airline company, carried
$61,215 in cash in her purse while traveling from New York to the Dominican Republic without
reporting the money.  Upon arrival in the Dominican Republic, Customs and Border Protection
agents stopped Ms. Pujols and found the undeclared currency.  As a result of her actions, Ms.
Valerio lost her job at the airline.  Although she was never explicitly informed that the money
was the proceeds of drug money, Ms. Valerio knew that this was something that she should not
have done and deeply regrets her actions.  Ms. Valerio also understands that she should have
known that the proceeds were from drug money and asked the appropriate questions rather than
ignoring the red flags:

> Regardless of our relationship, I should never have let my
> circumstances and trust in an individual blind me. I regret not
> asking more questions about the money and I regret bringing the
> money at all because I knew it was something that I should not
> have engaged with in the first place. I have had to live with the
> repercussions of my actions every day since the start of this case,
> and it has been the most difficult situations I have faced in my life.
>
> The embarrassment and shame I feel every day because of my
> actions have been unbearable. I feel guilty for putting my friends,
> family, husband, and, most importantly, my son through something
> like this.

Ex. A at 2.  Ms. Valerio deeply regrets that she engaged in these acts and knows she should have
exercised better judgment rather than allowing her fertility struggles and accompanying debt to
take center stage.

## Post-Offense Conduct

Since 2019, Ms. Valerio continued with her fertility struggles.  However, ten days after
the instant offense, Ms. Valerio completed another IUI procedure, at which time she conceived
her now four-year-old son, █████  After trying to conceive for eight years, Ms. Valerio and Mr.
Perez were stunned and overjoyed.  Initially, Ms. Valerio stayed at home with ██████ but as her
mother grew ill, she found work as her mother's home health aide as she struggled with daily
tasks due to, among other things, her severe arthritis, osteoporosis, and had already broken her
arm due to falling twice.  Ms. Valerio, the only of her siblings to remain in New York, was
happy that she was able to assist her mother, who was now in her 80s, and provide financial
support for her growing family.





*Ms. Valerio, Mr. Perez, and*                                        *Ms. Valerio and*

       In addition to working as a home health aide, Ms. Valerio was concerned about her future and wanted to fulfill her dream of obtaining a college degree. Understanding the challenges of having a young child and beginning schooling, Ms. Valerio was undeterred and applied for the PINACLES Program at Kelm Business School. See Kelm Acceptance Letter, attached as Exhibit D. PINACLES is a professional development program that helps cultivate in-demand skills and knowledge for high growth industries. On May 6, 2024, Ms. Valerio was accepted into the program. She was excited for the opportunity to reengage as a student, which she hoped could better prepare her for new professional industries. Her excitement, however, was short-lived as the next day, on May 7, 2024, she was arrested on the instant matter.

## A Time Served Sentence with a Period of Home Incarceration is the Appropriate Sentence

       "In deciding what sentence will be 'sufficient, but not greater than necessary' to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." United States v. Singh, 877 F.3d 107, 121 (2d Cir. 2017) (second internal quotation marks omitted). Although the agreed upon Guidelines range is 18 to 24 months, Probation recommends a downward variance to 366 days. While the defense agrees that a downward variance is appropriate in this case, Probation's recommendation is still inappropriately harsh. In the unique circumstances of this case, it is not necessary to separate a remorseful, fully rehabilitated, first-time offender from her child. A noncustodial sentence of supervised released with a term of home confinement is sufficient.

       The nature and circumstances of Ms. Valerio's offense are mitigated by her personal history and characteristics. See § 3553(a)(1). She engaged in this aberrational offense at a low point in her life to finance her ongoing fertility issues. Indeed, her longtime childhood friend,

who asked her to travel with money on his behalf, utilized her fertility struggles and the accompanying expenses to encourage her to assist him in transporting money for him for a small repayment. She is extremely remorseful, and he has demonstrated as much.

A noncustodial sentence of supervision and home detention best advances the purposes of sentencing in this case. See § 3553(a)(2). With respect to punishment and deterrence, § 3553(a)(2)(A)–(B), it is significant that Ms. Valerio has never before been convicted of any crime or even arrested. A first felony conviction is itself a significant sanction carrying life-altering collateral consequences for which Ms. Valerio has been wading through already. See generally United States v. Nesbeth, 188 F. Supp.3d 179, 182 (E.D.N.Y. 2016) ("Today, the collateral consequences of a felony conviction form a new civil death. Convicted felons now suffer restrictions in broad ranging aspects of life that touch upon economic, political, and social rights."). Indeed, Ms. Valerio, who was offered a remote position as a Spanish Bilingual Customer Service Representative at CVS Health, which allows her to both work and care for her son at home, has had the offer held in abeyance until her sentencing in the instant matter. Ex. C. Ms. Valerio is appropriately concerned that a sentence of incarceration will cause to lose this job opportunity that was so challenging for her to obtain in light of the instant matter. Additionally, her heretofore unblemished record also means that a smaller punishment has a larger impact on her than it might on someone who had previously been imprisoned but continued to offend. See, e.g., United States v. Mishoe, 241 F.3d 214, 220 (2d Cir.2001) (recognizing in the context of the career offender guideline that the amount of prior prison time is relevant to determining the deterrent effect of the sentence to be imposed).

In this context, supervision by itself can be a sufficient punishment because it represents a substantial restriction on an individual's liberty. See Gall v. United States, 552 U.S. 38, 48 (2007). That is true, a fortiori, when home detention is imposed as a special condition. Home detention is such a significant restriction on a person's liberty that both Congress and the Sentencing Commission have equated it with imprisonment. See 18 U.S.C. § 3563(b)(19) (home detention may be imposed as a condition of probation "only as an alternative to incarceration"); U.S.S.G. § 5C1.1 (e) (3) ("Schedule of Substitute Punishments") (If giving a non-incarceratory sentence, one day of home detention is equal to one day of imprisonment); § 5F1.2 ("Home detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment."); see also United States v. Fiume, 643 F. App'x 25, 28 (2d Cir. 2016) ("Home detention is a distinct condition that is significantly more onerous than GPS monitoring.").

The public needs no protection from Ms. Valerio, who has pled guilty to a nonviolent offense. Cf. § 3553(a)(2)(C). Empirical research by the U.S. Sentencing Commission indicates Ms. Valerio's lack of criminal history place Ms. Valerio among the least likely to recidivate. See U.S. Sentencing Commission Research Series on the Recidivism of Federal Guideline Offenders, "A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score" at 15–16 (2005).[1] She "has kept all court appearances and has been in compliance with all terms and conditions of his [sic] pretrial release [and] is not viewed as a flight risk or a danger to the community." PSR at 28. While on pretrial release, Ms.

---

[1] Available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2005/20050104_Recidivism_Salient_Factor_Computation.pdf

Valerio has been permitted to travel to Missouri and Indiana.  During these trips, Ms. Valerio returned on schedule, validating the trust the Court placed her and underscoring that she will succeed on post-sentencing supervision.

Moreover, as a zero-point offender, Ms. Valerio is entitled to a two-point downward adjustment, which the Sentencing Commission added to specifically account for the significantly lower rates of recidivism among zero-point offenders.  See U.S.S.G. § 4C1.1(a); U.S. Sent'g Comm'n, Amendments to the Sentencing Guidelines at 52. ("Recidivism data analyzed by the Commission shows, however, that offenders with zero criminal history points have considerably lower recidivism rates than other offenders, including offenders with one criminal history point.").  Indeed, according to the Commission's 2023 amendments, the two-point offense level reduction for defendants, like Ms. Valerio, that have zero criminal history points is to account for the "considerably lower recidivism rates than other offenders, including offenders with one criminal history point."  U.S. Sent'g Comm'n, Adopted Amendments 2023 at 79 (citing U.S. Sent'g Comm'n, Recidivism of Federal Offenders Released in 2010 (2021), available at https://www.ussc.gov/research/researchreports/recidivism-federal-offenders-released-2010). In supporting this amendment, the Commission noted that "[a]mong other findings, the report concluded that 'zero-point offenders' were less likely to be rearrested than 'one point' offenders (26.8% compared to 42.3%), the largest variation of any comparison of offenders within the same Criminal History Category."  Id. at 79.

Ms. Valerio has shown that she presents a low risk of recidivism and has fully rehabilitated herself since the underlying conduct ended over five years ago – in 2019.  See § 3553(a)(2)(D).  Although Ms. Valerio was arrested for the instant matter in 2024, her criminal conduct concluded in 2019 – well before the filing of any criminal charges, demonstrating her commitment and ability to lead a law-abiding life without the need for additional punishment.  Since then, she worked hard to find and maintain employment as a home health aide for her mother and has now sought new employment and educational opportunities for herself since her mother now resides in Missouri to join her other children and her husband in his final stages of cancer.  Specifically, Ms. Valerio, in addition to finding employment at CVS Health, has also successfully completed the PINACLES program at Kelm Business School – a program she applied to before her arrest in this case.  See Ex. D; Kelm Certificate of Completion, attached as Exhibit E.  Ms. Valerio's motivation to learn and grow even before her arrest in this matter is a testament that the goals of deterrence and rehabilitation have already been achieved in this case without the need for a term of incarceration.  There is no doubt that Ms. Valerio will continue to work hard in the community. By contrast, "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

In fact, Ms. Valerio is needed in the community because she is an engaged, supporting, and loving mother to her son.  A sentence of imprisonment would fall hardest on him. An April 2016 report by the Annie E. Casey Foundation documents "the devastating toll of parental incarceration on kids, families and communities." Report of the Annie E. Casey Foundation, "A Shared Sentence", attached as Exhibit F. It finds:

> Having a parent incarcerated is a stressful, traumatic experience of
> the same magnitude as abuse, domestic violence and divorce, with
> a potentially lasting negative impact on a child's well-being. These

> young children lose a parent's support during their critical early
> years, a time when their families and communities should be laying
> the foundation for healthy development and success.

Ex. F at 3.  This, too, calls for a noncustodial sentence.  See United States v. Mateo, 299 F. Supp. 2d 201, 211 (S.D.N.Y. Jan. 9, 2004) (Marrero, J.) ("[I]nsofar as the incarceration of a particular offender imposes terms and conditions that expand the reach of consequences ordinarily associated with confinement substantially beyond the zone of what is to be reasonably foreseeable . . . in the typical case, the corresponding sentence is likely to work excessive hardships.").  A term of time served and three years' supervised release with home incarceration would adequately punish Ms. Valerio without unduly damaging the life of her young child.  See United States v. Milikowsky, 65 F.3d 4, 8 (2d Cir. 1995) ("Among the permissible justifications" for a below-Guidelines sentence "is the need, given appropriate circumstances, to reduce the destructive effects that incarceration of a defendant may have on innocent third parties."); United States v. Johnson, F.2d 124, 126–30 (2d Cir. 1992) (holding that where the defendant's incarceration would "wreak extraordinary destruction" on the defendant's four young dependents, a below-Guidelines sentence to avoid imprisonment was warranted).

As explained in the numerous letters of support from Ms. Valerio's family and friends, a sentence of incarceration would be devastating to Ms. Valerio's family as she is the primary caretaker for her four-year-old son, ████.  Her husband, Eddy Perez, describes Ms. Valerio as "the pillar of our family, the one who runs the house and takes care of our child and his schooling single-handedly.  There are days when I don't even sleep just thinking about the impact this would have on our lives if Sarah were to be gone for a while."  Ex. B at 1-2.  Mr. Perez's fears are not unfounded as a term of incarceration might require him to "find a new job entirely to pick-up the responsibilities of our child . . . because we can't afford to pay for a babysitter.  I have no idea how I would deal with being our son's only caretaker while working and I dread the thought of this becoming our reality."  Ex. B at 2.  Her extended family and friends agree.  As her long-time friend, Dioffre Cruceta, observes,

> The possibility of being without Sarah has had a tremendous
> impact on her immediate family, who may have to raise ████
> without her. This potential separation is devastating for all of them,
> highlighting how integral Sarah is to their lives. The emotional and
> practical support she provides is irreplaceable. I've seen the strain
> on her family firsthand. Her absence would not only be a logistical
> challenge, but an emotional void that will be impossible to fill for
> such a close family.

Ex. B at 18.  Given the devastating impact a term of incarceration would have on Ms. Valerio's family and young son, a nonincarceratory is warranted in this case.

Finally, sentencing Ms. Valerio to a home confinement rather than prison will not create any unwarranted sentencing disparities. § 3553(a)(6). Although Ms. Valerio never possessed drugs in connection with the instant offense, the sentencings in courier cases are instructive.  For example, courts routinely declined to send first-time drug offenders, to prison, even where the quantity involved is substantial or when there are aggravating factors. See, e.g., United States v.

Carmona Carmona, 22 Cr. 434, ECF No. 61 (Jan. 19, 2024) (Torres, J.) (individual charged with narcotics conspiracy with a Guideline range of 57 to 71 months sentenced to time served (zero months)); United States v. Baires Novoa, 22 Cr. 434, ECF No. 61 (Jan. 19, 2024) (Torres, J.) (individual charged with narcotics conspiracy with a Guideline range of 46 to 57 months sentenced to time served (zero months)); United States v. Acosta, 22 Cr. 628, ECF No. 74 (Feb. 14, 2024) (Swain, J.) (courier in narcotics conspiracy with a Guideline range of 78 to 97 months sentenced to four years' probation including ten months of home detention); United States v. Pimental, 21 Cr. 451, ECF No. 45 (Aug. 10, 2022) (Rakoff, J.) (individual charged with narcotics conspiracy with a Guideline range of 70 to 87 months sentenced to time served (two months)); United States v. Lias, 18 Cr. 37, ECF No. 149 (Aug. 15, 2019) (Gardephe, J.) (individual charged with narcotics conspiracy with a Guideline range of 57 to 71 months sentenced to time served (three months)); United States v. Sampson, 20 Cr. 192, ECF No. 79 (Apr. 14, 2022) (Oetken, J.) (individual charged with narcotics conspiracy with a Guideline range of 46 to 57 months sentenced to time served (ten months)); United States v. Henderson, 23 Cr. 342, ECF No. 36 (May 15, 2024) (Clarke, J.) (individual charged with narcotics conspiracy with a Guideline range of 37 to 46 months sentenced to time served with six months of home detention); United States v. Ansures Almazan, 21 Cr. 722, ECF No. 54 (Aug. 25, 2022) (McMahon, J.) (courier in narcotics conspiracy with a Guideline range of 70 to 87 months sentenced to time served with one year of home detention); United States v. Toles, 18 Cr. 841, ECF No. 48 (Sept. 27, 2019) (Broderick, J.) (individual charged with narcotics conspiracy with a Guideline range of 30 to 37 months sentenced to one year of home detention).

Indeed, a time served sentence with a term of home detention would be especially appropriate here to ensure there is no sentencing disparity with her codefendant, Charlie Hernandez. On December 20, 2024, Mr. Hernandez was sentenced to three months incarceration to be followed by three years of supervised release, nine months of which are to be served in home incarceration. Mr. Hernandez, who does not have children or the same familial responsibilities as Ms. Valerio, faced a higher Guidelines sentence of 24 to 30 months' incarceration as his conduct involved carrying a higher quantity of money ($120,000) to the Dominican Republic. Moreover, unlike Ms. Valerio's blinding desperation to finance prohibitively expensive fertility treatments, Mr. Hernandez's conduct was, according to the government's sentencing submission, "somewhat inexplicable from a financial standpoint" as he had both a "robust salary" and no children. United States v. Hernandez, 24 Cr. 447 (RA), ECF No. 31 at 13 (Dec. 13, 2024). The differences between Mr. Hernandez and Ms. Valerio as to motivation and the quantity of cash delivered are significant and should be reflected in their sentences. Accordingly, to ensure that Ms. Valerio receives a fair and just sentence, especially as compared to her more culpable codefendant with less mitigation to inform his conduct, a sentence without a term of incarceration is appropriate here.

## Conclusion

Sarah Valerio Pujols is deeply sorry for her actions. Although undoubtedly grave, the offense in this case is an aberration within Ms. Valerio's life-history. Ms. Valerio is a hard worker and the primary caretaker for her young child that she regrettably risked everything to conceive. In the past five years, Ms. Valerio's conduct has made clear that she not only continues

to be a tireless worker and a loving mother but also that she has been deterred from future illegal conduct and can flawlessly abide by the rules of supervision. Given that a noncustodial term would satisfy the needs of sentencing in this case, Ms. Valerio's son should not be unnecessarily deprived of his mother and primary provider. Yet a custodial sentence would do just that. For the rest of her life, Ms. Valerio will feel the impact of this conviction – and has already through her challenges finding new employment. Incarceration is not necessary to ensure Ms. Valerio's compliance with our laws. A noncustodial sentence achieves the goals of sentencing in this case.

       Thank you for your consideration of this request.

Respectfully submitted,

_____
Marisa K. Cabrera
Assistant Federal Defender
(212) 417-8730

cc:    AUSA Benjamin Anthony Gianforti