


# A SHARED SENTENCE

the devastating toll of parental incarceration on kids, families and communities






APRIL 2016

## policy report

KIDS COUNT




THE ANNIE E. CASEY FOUNDATION

**ABOUT THE ANNIE E. CASEY FOUNDATION AND KIDS COUNT**

**The Annie E. Casey Foundation** is a private philanthropy that creates a brighter future for the nation's children by developing solutions to strengthen families, build paths to economic opportunity and transform struggling communities into safer and healthier places to live, work and grow. To learn more, visit www.aecf.org.

**KIDS COUNT®**, a project of the Annie E. Casey Foundation, is a national and state-by-state effort to track the status of children in the United States. By providing policymakers and citizens with benchmarks of child well-being, KIDS COUNT seeks to enrich local, state and national discussions concerning ways to secure better futures for all children. To learn more, visit www.aecf.org/kidscount.

To order this report, visit www.aecf.org/sharedsentence.

To find additional data on children and families, visit the KIDS COUNT Data Center at datacenter.kidscount.org.

# A SHARED SENTENCE

## the devastating toll of parental incarceration on kids, families and communities

**The saying is all too familiar: Do the crime, do the time. But in America's age of mass incarceration, millions of children are suffering the consequences of their parents' sentences and our nation's tough-on-crime practices.**

These children feel the absence of that adult — whether it is several nights in jail or years in prison — in myriad ways, even if they weren't sharing a home.[1] They feel it when their refrigerator is bare because their family has lost a source of income or child support. They feel it when they have to move, sometimes repeatedly, because their families can no longer afford the rent or mortgage. And they feel it when they hear the whispers in school, at church or in their neighborhood about where their mother or father has gone.

Incarceration breaks up families, the building blocks of our communities and nation. It creates an unstable environment for kids that can have lasting effects on their development and well-being.[2] These challenges can reverberate and multiply in their often low-income neighborhoods, especially if they live in a community where a significant number of residents, particularly men, are in or returning from jail or prison.[3] And different obstacles emerge once parents are released and try to assume their roles as caregivers, employees and neighbors.

This report recommends policies and practices that put the needs of children of incarcerated parents first. We call on correctional systems, communities and state and local public agencies to help stabilize families and preserve their connections during incarceration — and successfully move forward once parents come home.

As the U.S. prison population surged during the past several decades, so too did the number of children and families experiencing the consequences of having a loved one incarcerated.[4] From 1980 to 2000, the number of kids with a father in prison or jail rose by 500 percent.[5] Now more than 5 million children have had a parent incarcerated at some point in their lives, including 503,000 in California, 477,000 in Texas and 312,000 in Florida. The situation is even worse in many other states, especially Kentucky, which has the highest rate of children — 13 percent — who have had a parent incarcerated.[6]

There is no question that our country's practice of mass incarceration is flawed, costly and in need of change. Policymakers on both sides of the aisle have pushed for

### Jail vs. Prison

While definitions vary by state, jails generally fall under local jurisdiction. They confine individuals who are awaiting trial or sentencing, or who have sentences shorter than one year, usually for misdemeanors. Prisons are state or federal facilities for individuals who have committed felonies or have sentences longer than one year.[7] Although our focus is primarily on children whose parents are serving prison sentences, jail time can be equally disruptive to families, making it difficult for remaining caregivers to maintain a job, housing and child care.

better solutions,[8] and several states have overhauled their correctional systems, favoring less costly alternatives for addressing nonviolent offenses, while maintaining public safety.[9] Many advocacy efforts also recognize the wildly disproportionate impact of the criminal justice system on people of color, especially African-American men, who are far more likely to be arrested and spend time behind bars.[10] As a result, children of color are inevitably more likely to contend with having a parent in prison.[11]

Yet policy debates about incarceration rarely focus on the burden borne by children and families. Theirs are stories of things lost: connections, jobs, income, homes — and hope. And communities, in turn, suffer from losing so many parents, whose absence leaves the economic and social fabric of their neighborhoods in tatters.

While momentum for criminal justice reform continues to build, we know progress will take time. But we also know children can't wait — nor can we as a nation afford to let them and their parents flounder, perpetuating poverty from one generation to the next.[12] Children need stability and support to minimize the impact of incarceration on their lives, which requires families and communities equipped to properly care for them, as well as parents prepared to provide for them and contribute to their communities upon release.

### THE CHILDREN AND FAMILIES LEFT BEHIND

Nationally, the number of kids who have had a parent in jail or prison at some point in their childhood hovers around 5.1 million — a conservative estimate. Among states, the percentage of children with an incarcerated parent varies dramatically, from only 3 percent in New Jersey to 13 percent in Kentucky.[13]

Overwhelmingly, incarcerated parents are fathers, many of them young. In state and federal prisons, about 45 percent of men age 24 or younger are fathers. For the same age group, about 48 percent of women in federal prison and 55 percent in state facilities are mothers. Although the percentages are higher for women, the actual numbers of mothers behind bars are a fraction of those for fathers, mirroring the total prison population.[14] The number of children with a father in prison rose by more than half between 1991 and 2007, and those with a mother behind bars more than doubled.

Children with a parent who is incarcerated are typically younger and living in low-income families of color, usually with a young single mother who has limited education.[15] Most are younger than 10. More than 15 percent of children with parents in federal prison — and more than 20 percent with parents in state prison — are 4 or younger.[16] Compared with their white peers, African-American and Latino kids are over seven and two times more likely, respectively, to have a parent incarcerated.[17] Although national data on American Indian children are unavailable, state trends show a similar pattern: American Indian kids in Oklahoma are twice as likely as white children to have an incarcerated parent and about five times more likely in the Dakotas.[18]

Even if parents were not living with their children before incarceration, more than half provided the primary financial support.[19] Children with incarcerated mothers are more likely than those with incarcerated fathers to end up living with grandparents or family friends or in foster care — and, as a result, tend to experience greater disruption and instability.[20]

Kids with incarcerated parents also are significantly less likely to live in neighborhoods that are able to be supportive of families. Their parents are more likely to report feeling unsafe in their communities and less likely to feel they have people on whom they can rely for help with their children.[21]

## WHAT PARENTAL INCARCERATION MEANS FOR KIDS, THEIR FAMILIES AND COMMUNITIES

For children and families, incarceration is not a one-time event but a daily reality that lasts well beyond a jail sentence or prison term. Without links between and among the criminal justice system and schools, neighborhood health centers and other community- and faith-based agencies and programs, families have little to guide them through this time.

### An Added Financial Burden

Incarceration is a destabilizer, pushing families teetering on the edge into financial disaster. Losing a parent who is the breadwinner, often for a prolonged period, leaves families scrambling to cover basic needs along with legal and other court fees.[22] When fathers are incarcerated, family income can drop by an average of 22 percent.[23] When no parent remains to care for a child, extended family members step in — often without proper support.[24]

This loss of income creates ripples that grow into waves. Families who already relied on public programs, such as the Supplemental Nutrition Assistance Program and Temporary Assistance for Needy Families, become increasingly dependent on them.[25] As they shoulder more responsibilities to fill the breach, parents and other relatives can struggle to manage their finances and face reduced earning potential.[26] Parents left behind are more likely to cite problems with child care as a reason for quitting or not taking a job.[27] Mothers also report being unable to pay for necessities such as food, utilities, rent and medical care for their children.[28] A recent survey found that 65 percent of families with a member in prison or jail could not meet basic needs. Thousands of dollars in court-related fines and fees, along with costly visits to maintain contact, landed nearly one-third in debt.[29]

In addition, children of incarcerated parents move more frequently than their peers, even more so when both parents are imprisoned.[30] Kids with fathers in prison, particularly African-American children, are at greater risk of ending up homeless.[31] Indeed, research suggests the rise in incarceration over several decades has contributed to a significant increase in child homelessness, especially among African Americans.[32] Housing instability disrupts connections with family, friends, schools and other support networks.[33]

### A Blow to Child and Family Health and Well-Being

Having a parent incarcerated is a stressful, traumatic experience of the same magnitude as abuse, domestic violence and divorce, with a potentially lasting negative impact on a child's well-being.[34] These young children lose a parent's support during their critical early years, a time when their families and communities should be laying the foundation for healthy development and success.[35] Their bonds to that parent are weakened, or sometimes never formed, as distance may keep them from making regular visits. The loss of that bond is especially devastating for children with incarcerated mothers.[36] The trauma of being separated from a parent, along with a lack of sympathy or support from others, can increase children's mental health issues, such as depression and anxiety, and hamper educational achievement.[37] Kids of incarcerated mothers, in particular, are at greater risk of dropping out of school.[38] Teachers can further undermine children's performance and self-esteem by lowering their academic expectations.[39] And when these kids grow up, they are more likely to contend with poor mental and physical health.[40]

Single mothers left to take on unexpected financial responsibilities[41] may also suffer from poor health, addiction, depression or anxiety, or they may be dealing with their own traumatic experiences.[42] Bearing

> Having a parent incarcerated is a stressful, traumatic experience of the same magnitude as abuse, domestic violence and divorce.

> If incarceration rates hadn't increased during a 24-year period, the U.S. poverty rate would have fallen by 20 percent, rather than remaining relatively steady.

those conflicted emotions and stress makes it all the more challenging to be the port in a storm for their children.

### A Drain on Community Resources and Opportunity

The communities where children live don't go unscathed, either. Many are mired in poverty and contend with crime, poor-quality housing, low-performing schools and a dearth of resources that further prevent families from creating a safe and nurturing home environment.[43] The effects of incarceration exacerbate the situation.[44] One study found that if incarceration rates hadn't increased during a 24-year period, the U.S. poverty rate would have fallen by 20 percent, rather than remaining relatively steady.[45]

In areas where a sizable portion of residents are behind bars, the effect is cumulative: The sheer number of absent people depletes available workers and providers, while constraining the entire community's access to opportunity — including individuals who have never been incarcerated.[46] The continual cycle of residents going to and returning from prison makes for places, and faces, constantly in flux.[47] Just living in a neighborhood with a high incarceration rate increases residents' chances of suffering from depression and anxiety.[48] Even for residents who have had no contact with the criminal justice system, heightened police vigilance can cast a shadow over their children, families and homes. And the absence of parents, most of them fathers, weakens neighborhoods and tears apart social networks, which, in turn, affects the local economy.[49] Parents' inability to find work when they return home further destabilizes their communities and increases their likelihood of reverting to criminal activity.

### New Obstacles for Families When Parents Return

**Barriers to Employment.** Time behind bars limits parents' options for steady employment that pays well enough to support their kids. Their lack of training or work experience and an interrupted or illegitimate employment history, combined with typically low literacy levels and educational attainment, close the doors to most family-supporting jobs.[50] Having to check the box on a job application that confirms their criminal record seals those doors tight.[51]

As a result, when parents who have spent time in prison can find jobs, they work fewer weeks annually and earn less than their counterparts without a record.[52] Two-thirds of formerly incarcerated men at the bottom of the income ladder in 1986 remained there two decades later.[53] Families with fathers who have been incarcerated are more likely to live in poverty than those who have never experienced the effects of incarceration.[54]

**Barriers to Housing.** Returning parents struggle to find or maintain safe, stable housing for their families or, if they live apart, just for themselves. Although the U.S. Department of Housing and Urban Development's public housing regulations permit them as residents, local housing authorities can exercise discretion — and frequently do, with blanket bans on people with criminal records. Private landlords automatically reject these individuals without considering whether their criminal histories pose any danger to other residents.[55]

All of these challenges — financial and housing instability, stress, emotional difficulties, broken family relationships and communities ill-equipped to bolster children amid great uncertainty — are a minefield nearly impossible for kids to traverse without incident. Changes in state and federal policies, as well as targeted reinvestment of funds saved from recent criminal justice reform efforts, can significantly change the trajectory of children with a parent in prison, helping them navigate choppy waters with greater ease.

TABLE 1

## Children Who Have Experienced Parental Incarceration: 2011–2012

Nationally, the number of kids who have had a parent in jail or prison at some point in their childhood hovers around 5.1 million — a conservative estimate. Kids with incarcerated parents are significantly less likely to live in neighborhoods that are able to be supportive of families.

|  | Total | | | Total | |
|---|---:|---:|---|---:|---:|
|  | Number | Percentage |  | Number | Percentage |
| United States | 5,113,000 | 7 | Missouri | 98,000 | 7 |
| Alabama | 88,000 | 8 | Montana | 18,000 | 8 |
| Alaska | 18,000 | 10 | Nebraska | 41,000 | 9 |
| Arizona | 138,000 | 9 | Nevada | 55,000 | 8 |
| Arkansas | 61,000 | 9 | New Hampshire | 15,000 | 5 |
| California | 503,000 | 5 | New Jersey | 65,000 | 3 |
| Colorado | 60,000 | 5 | New Mexico | 52,000 | 10 |
| Connecticut | 36,000 | 5 | New York | 148,000 | 4 |
| Delaware | 15,000 | 8 | North Carolina | 179,000 | 8 |
| District of Columbia | 9,000 | 8 | North Dakota | 10,000 | 7 |
| Florida | 312,000 | 8 | Ohio | 271,000 | 10 |
| Georgia | 189,000 | 8 | Oklahoma | 96,000 | 10 |
| Hawaii | 16,000 | 5 | Oregon | 68,000 | 8 |
| Idaho | 35,000 | 8 | Pennsylvania | 181,000 | 7 |
| Illinois | 186,000 | 6 | Rhode Island | 10,000 | 5 |
| Indiana | 177,000 | 11 | South Carolina | 73,000 | 7 |
| Iowa | 58,000 | 8 | South Dakota | 17,000 | 8 |
| Kansas | 45,000 | 6 | Tennessee | 144,000 | 10 |
| Kentucky | 135,000 | 13 | Texas | 477,000 | 7 |
| Louisiana | 94,000 | 8 | Utah | 44,000 | 5 |
| Maine | 20,000 | 8 | Vermont | 7,000 | 6 |
| Maryland | 82,000 | 6 | Virginia | 103,000 | 6 |
| Massachusetts | 69,000 | 5 | Washington | 109,000 | 7 |
| Michigan | 228,000 | 10 | West Virginia | 34,000 | 9 |
| Minnesota | 67,000 | 5 | Wisconsin | 88,000 | 7 |
| Mississippi | 55,000 | 7 | Wyoming | 12,000 | 9 |

SOURCE  Child Trends' analysis of the 2011–12 National Survey of Children's Health for the Annie E. Casey Foundation. These data only include children whose incarcerated parent lived with them at some point.

# Incarceration's Toll on Communities

While incarceration hits children and their families hard, their communities also feel the blow. Many are already mired in poverty and contend with crime, poor-quality housing, low-performing schools and a dearth of resources that further prevent families from creating a safe and nurturing home environment. The effects of incarceration exacerbate the situation, particularly in areas where a sizable portion of residents are behind bars. The sheer number of absent people can constrain an entire community's access to opportunity — including individuals who have never been incarcerated.

A closer look at three U.S. cities reinforces these points and reveals how dramatically the impact of incarceration varies from one neighborhood to another. Yet certain themes transcend population size and geography. Communities with a consistently high and disproportionate rate of people returning from prison tend to have larger percentages of African-American residents, echoing our criminal justice system's uneven impact on people of color. They also often have the highest child poverty rates in their cities.

## ATLANTA

Atlanta is organized into 25 neighborhood planning units (NPUs). NPUs J, L, V and Z represent 11 percent of the city's population but are home to 25 percent of its residents returning from prison. All four communities, which are mostly African American, exceed the city's average child poverty rate, and NPUs L, V and Z more than double it. By contrast, only about 1 percent of returning individuals live in the majority-white NPU-E, although its population is nearly the same as the other four areas combined. All but two of Atlanta's predominantly African-American communities have higher-than-average percentages of residents returning from prison.



PRISON RELEASES PER 1,000 ADULTS

- 0–1.88
- 2.48–4.71
- 6.28–7.58
- 9.17–13.81

SOURCE  Justice Mapping Center's analysis of 2010 data from the Georgia Department of Corrections and the U.S. Census Bureau's American Community Survey for the Annie E. Casey Foundation.

## INDIANAPOLIS

In Indianapolis, District 17's incarceration and reentry rates are the highest in the city and 18 times those of District 3, which has the lowest rates. Although each area comprises about 5 percent of the city's population, District 17 is home to 12 percent of all residents returning from prison. By comparison, District 3 is home to less than 1 percent. District 17's child poverty rate far exceeds the city average and is triple the rate in District 3; it also has almost three times as many African-American residents.



SOURCE  Justice Mapping Center's analysis of 2010 data from the Indiana Department of Correction and the U.S. Census Bureau's American Community Survey for the Annie E. Casey Foundation.

## PROVIDENCE

Fox Point and neighboring Lower South Providence each represent about 2 percent of Providence residents. But in Lower South Providence, the percentage of people returning from prison is five times higher, at 5 percent, than Fox Point's 1 percent. Lower South Providence also has the city's highest child poverty rate, which is more than triple that of its neighbor. More than 35 percent of its residents are African American, compared with only 1 percent in Fox Point.



SOURCE  Justice Mapping Center's analysis of 2010 data from the Rhode Island Department of Corrections and the U.S. Census Bureau's American Community Survey for the Annie E. Casey Foundation.

# RECOMMENDATIONS
building a stronger support system for children

Children of incarcerated parents — like all children — need strong, supportive families and communities. Making smart investments in them, their families and the places where they live can help ensure they have solid support systems.

One key source for these investments could be savings from the national Justice Reinvestment Initiative, which focuses on creating a more cost-effective approach to criminal justice, while maintaining public safety. Several states participating in the initiative, including Arkansas, Georgia and Louisiana, have redirected funds to community-based treatment programs, transitional housing or reentry support.[56] As more states continue to save, they could funnel some of these funds toward programs and tools to help promote healthy child development and strengthen families and communities.

Although such investments are critical, the most powerful step, by far, is to reduce our nation's overreliance on incarceration. The Justice Reinvestment Initiative, as well as the Annie E. Casey Foundation's decades of work in juvenile justice, clearly shows that significantly reducing our use of correctional facilities saves money without compromising public safety — and focuses attention on lasting solutions that allow people to succeed and leave their criminal past behind them, instead of reliving it.[57]

Taking this step means reexamining our nation's decades-old policies on sentencing, bail, probation and parole, exploring shorter sentences and alternatives to jail and prison for nonviolent crimes, which represent the majority of offenses among people serving time.[58] It also means curbing the use of jails to hold people awaiting trial who can't afford bail and, consequently, end up losing jobs, child care or homes — even if they are absolved of wrongdoing. These fundamental changes to America's criminal justice system would dramatically decrease the number of people — and, therefore, parents — behind bars, the amount of time they stay there and the effects of their absence on their children, families and neighborhoods. Though some states have already moved in this direction, it is time that we as a nation revisit our notion of criminal justice and eliminate flawed policies and practices that unnecessarily and unfairly emphasize stringent approaches to meting out punishment.

Given the criminal justice system's overwhelmingly uneven impact on

children of color, discussions around policy and practice changes should evaluate the potential effect on these kids and their families — through racial equity impact assessments, for example — to avoid further harm.

Even as we continue pushing for comprehensive system reform, the urgent needs of children and families bearing the burdens associated with incarceration require us to act today. Within that context, we offer several recommendations for state and local policymakers, criminal justice systems, public agencies and community- and faith-based organizations to put children's best interests first when designing programs and policies around parents who are incarcerated.

### RECOMMENDATION ONE
**Ensure children are supported while parents are incarcerated and after they return.**

Children need permanent family connections and stability to do well, and their families need the financial and emotional wherewithal to support their well-being. Providing mental health and counseling programs to family members who step up as caregivers during incarceration can help children withstand the repercussions of this disruption in their lives.

Research shows preserving a child's relationship with a parent during incarceration benefits both parties. It also benefits society, reducing children's mental health issues and anxiety, while lowering recidivism and facilitating parents' successful return to their communities.[59] Few programs exist to support these relationships during incarceration, and, upon reunification, families are left to travel bumpy terrain on their own, from readjusting to life after prison to resuming parental roles. The minimal data available on children with incarcerated parents further complicate attempts to address their needs.

The very agencies and organizations that could help children and their families typically have no official or clear way to reach them. They also tend to operate in isolation, with different funding sources and guidelines that can further impede their ability to respond to child and family needs. The Children of Incarcerated Parents Bill of Rights offers a strong set of principles and recommendations for putting kids at the forefront before, during and after incarceration. It calls on police departments, courts, schools, correctional facilities and other institutions that touch children's lives to operate with them in mind.[60]

➡ State and federal criminal justice systems should preserve family connections during incarceration by encouraging judges and other key players to consider the impact on kids and families when making sentencing and prison-assignment decisions. These systems should require courts to inform local social service agencies and community-based organizations when a parent is incarcerated so that they can make contact with families. Prisons and jails also should develop visitation policies that allow children to maintain their parental relationships, such as providing transportation and family-friendly visiting centers in their facilities or offering other means of communication, including videoconferencing.

Hawaii law, for instance, calls for the director of public safety to consider the best interests of families first when placing parents in correctional facilities — consistent with public safety and security — and to ensure their geographic proximity and ability to maintain bonds with their children.[61] In several New York state prisons, the Osborne Association's FamilyWorks program creates a more child-friendly






environment through family centers in prison visiting rooms, in addition to offering parenting courses and individual and family counseling.[62]

▰ Early education centers, schools, child welfare agencies, community-based health centers and other local and faith-based organizations should offer programs that foster children's mental and emotional well-being. They should also provide mentoring and support groups for kids and teens whose parents are in prison, as well as for their families. This includes establishing administrative policies and connections between and among prisons and child welfare, health, education and employment and training agencies and programs so that all are aware of families in need of support.

Atlanta's Foreverfamily, for example, has after-school and leadership programs for children and teens with incarcerated parents, creating space for them to interact with peers and coordinating visits to prisons. In New York, the Center for Community Alternatives offers mentoring and support groups for Syracuse public school students whose parents are incarcerated.

▰ To support appropriate and safe family reunification, prisons and community organizations should provide family counseling and parenting courses while parents are incarcerated and after they return. If children enter foster care, child welfare agencies and courts should prioritize placements with other family members or friends who can care for them in the absence of both parents. The National Fatherhood Initiative's InsideOut Dad helps incarcerated fathers connect with their families and build parenting skills. Correctional facilities in about 25 states, including Alabama, Florida, New Jersey and Virginia, have used this program, which has documented increases in fathers' confidence, parenting know-how and contact with their kids.[63]

▰ States should support family caregivers in meeting children's needs by facilitating their access to financial, legal, health, child care and housing assistance. They also should offer these family members counseling and support groups to bolster their ability to be a steady source of comfort for kids.[64]

The National Family Caregiver Support Program allows states to direct some of their funding toward providing

grandparents and other relatives ages 55 and older with services, counseling and additional tools. Washington has a strong state network of kinship navigators to connect families with legal resources, health care for kids and parenting classes, and Tennessee's Relative Caregiver Program works with community-based organizations to provide services for children, teens and caregivers.[65]

### RECOMMENDATION TWO
**Connect parents who have returned to the community with pathways to employment.**

Upon release, parents face daunting tasks in trying to find work and rebuild their family and neighborhood networks. Obstacles to employment and restricted access to public programs such as food assistance hinder them from regaining their financial footing and supporting their children. Many parents leave prison with significant debts such as court fees — including bail and fines accrued before sentencing — as well as accumulated child support, with little means to pay them.[66] Automatic paycheck deductions for these debts can discourage parents from seeking legitimate avenues of work. Being unable to meet these obligations can unleash a vicious cycle: Not making required payments can lead to revoked parole and a return to prison, where parents are still unable to make payments.

Without education, training and work experience, parents who have been incarcerated can't compete for today's family-supporting jobs. They may also be dealing with traumas related to imprisonment that make it challenging to hold a job. While many prisons offer vocational training, it often falls short of teaching the skills that today's employers seek.

Providing sector-specific education and training — starting in prison — for jobs in high-demand industries such as information technology can help parents develop the skills necessary to resume their role as providers, while reducing their likelihood of returning to prison.[67] Research indicates that participating in prison education and training programs lowers the chances of reincarceration and increases the likelihood of securing employment.[68] In addition, every dollar spent on such programs cuts incarceration costs by four or five times that amount.[69] Beyond saving money, removing barriers to work could boost the economy, with increased income and sales tax contributions from gainfully employed parents.[70] Even when families do not reunite, it is important to equip parents to be effective providers and community members.

➡ States should take advantage of newly raised thresholds for funding prison education programs under the federal Workforce Innovation and Opportunity Act and direct more funds toward education and training for incarcerated individuals, preparing them for work in high-demand sectors. To meet the needs of today's job market, public and private employment and training programs should move beyond placing individuals with records in a handful of industries, such as construction or manufacturing, in which a criminal history isn't an automatic strike. Instead, they should identify a broader range of jobs and fields to target and help interested adults develop the skills necessary to start their own business.

For example, a training program in California's San Quentin State Prison teaches computer coding to open doors to jobs in technology. And a landscaping and horticultural program in Philadelphia prisons that provides job-placement assistance has reduced recidivism among participants to less than half of the city's rate.[71]

> **Without education, training and work experience, parents who have been incarcerated can't compete for today's family-supporting jobs.**

> The high-poverty neighborhoods that are home to many kids and families dealing with incarceration lack quality affordable housing, access to jobs, good schools and key resources.

➦ States should minimize the effects of a criminal record through ban-the-box policies that require public and private employers to postpone criminal history questions until they have chosen an applicant as one of the most qualified job candidates. Nearly 20 states — including Connecticut, Georgia and Minnesota — and more than 100 cities and counties, along with a number of businesses, have adopted ban-the-box policies. Several jurisdictions have documented a resulting increase in hiring individuals with records.[72] States also should use subsidized employment programs, which cover part of participants' wages for a trial period to help them prepare for permanent employment. Such programs incentivize employers in sectors that do not usually consider applicants who have a record.[73]

➦ States should enable families to access public programs such as the Supplemental Nutrition Assistance Program and Temporary Assistance for Needy Families so they can cover basic needs as formerly incarcerated parents work to earn income and achieve self-sufficiency. Although federal law prohibits people convicted of felony drug offenses from accessing both programs, states can choose to opt out or limit the ban. Many have done so, but several still have not.[74]

➦ States should suspend child support orders while parents are in prison so they don't accumulate crippling debt that they must start paying upon release. The District of Columbia and several dozen states, including Arizona and Michigan, allow incarcerated fathers to have their payments reduced or halted during their time in prison. California goes further, suspending child support orders if a parent is incarcerated for more than three months and unable to make payments.[75] Every state should offer to suspend such payments and proactively make parents aware of this option.

### RECOMMENDATION THREE
**Strengthen communities, particularly those disproportionately affected by incarceration and reentry, to promote family stability and opportunity.**

The communities where children reside can make or break a family's stability. Increasing communities' access to opportunity and strengthening community-based organizations and programs can help entire neighborhoods — and, therefore, the families living in them — minimize the economic and social effects of incarceration. The high-poverty neighborhoods that are home to many kids and families dealing with incarceration lack quality affordable housing, access to jobs, good schools and key resources. Together, these factors can impede children's academic success and increase their likelihood of dropping out of school. Growing up in such neighborhoods also lowers kids' chances of climbing the economic ladder as adults.[76]

Stronger, safer and healthier neighborhoods can reduce not only the likelihood of crime but encounters with law enforcement and the criminal justice system.

➦ Being able to obtain safe and stable homes bolsters child well-being and reduces recidivism.[77] State and local governments should provide incentives for housing authorities and private landlords to lift restrictions on people with records so that families can remain in or access safe, affordable housing. They also should offer training for property managers and caseworkers to ensure they properly interpret housing policies to enable formerly incarcerated parents to live with their families, as appropriate.

In Oregon, private landlords cannot discriminate based on a person's arrest record or certain types of convictions. Landlords in Newark, New Jersey, must weigh factors such as references for good conduct and the nature of a person's






criminal history in determining whether he or she can rent a home.[78] And a pilot program with the Housing Authority of the City of Los Angeles uses Section 8 vouchers to support family reunification.[79]

▶ To create additional pathways to jobs and careers, city governments and private employers should, when possible, take advantage of universities, hospitals and other anchor institutions[80] that are rooted in communities and promote economic inclusion strategies. The latter intentionally connect low-income residents and neighborhoods with job and contracting opportunities generated from economic development projects. Economic inclusion and anchor institution policies and programs should include the hiring of formerly incarcerated individuals, along with related training to ensure returning parents can access local jobs. These institutions also could support local businesses owned by individuals who were incarcerated.

For example, Cleveland's Evergreen Cooperative Initiative — a partnership of the Cleveland Foundation, the Cleveland Clinic, University Hospitals, Case Western Reserve University and city government — promotes the development of local, employee-owned businesses that train and hire low-income residents who are struggling to obtain employment, including people who were incarcerated.

## CONCLUSION

Without a doubt, people who break the law should face the consequences. Still, parents who are incarcerated do not live in isolation: They are fathers, mothers, partners, caregivers, breadwinners and community members, and their kids inevitably end up sharing their sentences.

Built into the very essence of the American Dream is the belief that children can, and should, have the opportunity to forge their own path, to reach far and stretch wide, regardless of where they grow up or who their parents are. The confinement of a parent should not doom a child to a lifetime of closed doors. Our hopes and dreams for children of incarcerated parents should be no different from the limitless horizon we seek for all of our children. They too deserve a blank page in our nation's great storybook — and the chance to shape their part of the tale as it continues to unfold for themselves, their future families and our whole country.

## ENDNOTES

1. Geller, A., Cooper, C. E., Garfinkel, I., Schwartz-Soicher, O., & Mincy, R. B. (2012, February). Beyond absenteeism: Father incarceration and child development. *Demography, 49*(1), 49–76. Retrieved from www.ncbi.nlm.nih.gov/pmc/articles/PMC3703506

2. This is well documented in a variety of studies. See, for example, Hairston, C. F. (2007, October). *Focus on children with incarcerated parents: An overview of the research literature*. Baltimore, MD: The Annie E. Casey Foundation. Retrieved from www.aecf.org/m/resourcedoc/aecf-FocusonChildrenwith_ncarceratedParentsOverviewofLiterature-2007.pdf. And, Wildeman, C., & Western, B. (2010). Incarceration in fragile families. *The Future of Children, 20*(2), 157–177. Retrieved from www.futureofchildren.org/futureofchildren/publications/docs/20_02_08.pdf. And, Geller, A., Garfinkel, I., Cooper, C. E., & Mincy, R. B. (2009, December 1). Parental incarceration and child wellbeing: Implications for urban families. *Social Science Quarterly, 90*(5), 1186–1202. Retrieved from www.ncbi.nlm.nih.gov/pmc/articles/PMC2835345. And, Lee, R. D., Fang, X., & Luo, F. (2013, April). The impact of parental incarceration on the physical and mental health of young adults. *Pediatrics, 131*(4), 1188–1195. Retrieved from www.ncbi.nlm.nih.gov/pubmed/23509174

3. Clear, T. R. (2008). The effects of high imprisonment rates on communities. *Crime and Justice, 37*(1), 97–132. Retrieved from http://myweb.fsu.edu/bstults/ccj5625/readings/clear-cj-2008.pdf

4. Wildeman, C., & Western, B. (2010). And, The Sentencing Project. (2015, November). *Fact sheet: Trends in U.S. corrections*. Washington, DC: Author. Retrieved from www.sentencingproject.org/doc/publications/inc_Trends_in_Corrections_Fact_sheet.pdf

5. Western, B., & Wildeman, C. (2009, January). The black family and mass incarceration. *The ANNALS of the American Academy of Political and Social Science, 621*(1), 221–242. Retrieved from http://scholar.harvard.edu/files/brucewestern/files/westernwildeman09.pdf?m=1378178398

6. Murphey, D., & Cooper, P. M. (2015, October). *Parents behind bars: What happens to their children?* Washington, DC: Child Trends. Retrieved from www.childtrends.org/wp-content/uploads/2015/10/2015-42ParentsBehindBars.pdf. And, Child Trends' analysis of the 2011–12 National Survey of Children's Health for the Annie E. Casey Foundation.

7. Bureau of Justice Statistics. (n.d.). *FAQ detail: What is the difference between jails and prisons?* Retrieved from www.bjs.gov/index.cfm?ty=qa&iid=322

8. Lillis, M. (2015, October 7) House leaders to unveil bipartisan criminal justice reforms. *The Hill*. Retrieved from http://thehill.com/homenews/house/256221-house-leaders-to-unveil-bipartisan-criminal-justice-reforms. And, Levy, G. (2015, October 1). Criminal justice reform bill hailed as bipartisan breakthrough. *U.S. News & World Report*. Retrieved from www.usnews.com/news/articles/2015/10/01/senates-criminal-justice-reform-bill-hailed-as-bipartisan-breakthrough

9. Gelb, A. (2015, July 30). *State criminal justice reforms build the case for data-driven federal legislation*. Washington, DC: The Pew Charitable Trusts. Retrieved from www.pewtrusts.org/en/research-and-analysis/analysis/2015/07/30/state-criminal-justice-reforms-build-the-case-for-data-driven-federal-legislation

10. Heath, B. (2014, November 19). Racial gap in U.S. arrest rates: "Staggering disparity." *USA Today*. Retrieved from www.usatoday.com/story/news/nation/2014/11/18/ferguson-black-arrest-rates/19043207

11. The Sentencing Project. (2009, February). *Incarcerated parents and their children: Trends 1991–2007*. Washington, DC: Author. Retrieved from www.sentencingproject.org/doc/publications/publications/inc_incarceratedparents.pdf

12. DeFina, R. H., & Hannon, L. (2009, February 23). The impact of mass incarceration on poverty. *Crime & Delinquency*. Retrieved from http://ssrn.com/abstract=1348049

13. Child Trends' analysis of the 2011–12 National Survey of Children's Health for the Annie E. Casey Foundation. This estimate only includes children whose incarcerated parent lived with them at some point. In this report, we rely on a variety of data sources to tell the story of children of incarcerated parents, their families and their communities. Because sources may have different data-collection methods, national estimates may vary by data source. See, for example, Murphey, D., & Cooper, P. M. (2015, October). And, Wildeman, C., & Western, B. (2010).

14. Glaze, L. E., & Maruschak, L. M. (2008, August). *Parents in prison and their minor children*. Washington, DC: U.S. Department of Justice, Office of Justice Programs. Retrieved from www.bjs.gov/content/pub/pdf/pptmc.pdf

15. Murphey, D., & Cooper, P. M. (2015, October). And, Schwartz-Soicher, O., Geller, A., & Garfinkel, I. (2011, September). The effect of paternal incarceration on material hardship. *The Social Service Review, 85*(3), 447–473. Retrieved from www.ncbi.nlm.nih.gov/pmc/articles/PMC4020140

16. Glaze, L. E., & Maruschak, L. M. (2008, August). And, Hairston, C. F. (2007, October).

17. The Sentencing Project. (2009, February).

18. Child Trends' analysis of the 2011–12 National Survey of Children's Health for the Annie E. Casey Foundation. Although national data for American Indian children are unavailable, the statistics on incarceration among men and women suggest that they, too, are more likely to have an incarcerated parent than their white peers. American Indian men are four times more likely to be incarcerated than their white counterparts; American Indian women are six times more likely to be incarcerated. For more information, see Lakota People's Law Project. (2015, February). *Native lives matter*. Santa Cruz, CA: Author. Retrieved from www.docs.lakotalaw.org/reports/Native%20Lives%20Matter%20PDF.pdf

19. Glaze, L. E., & Maruschak, L. M. (2008, August). And, La Vigne, N. G., Davies, E., & Brazzell, D. (2008, February 12). *Broken bonds: Understanding and addressing the needs of children with incarcerated parents*. Washington, DC: Urban Institute. Retrieved from www.urban.org/research/publication/broken-bonds-understanding-and-addressing-needs-children-incarcerated-parents/view/full_report

20. National Resource Center on Children & Families of the Incarcerated. (2014). *Children and families of the incarcerated fact sheet*. Camden, NJ: Rutgers University. Retrieved from https://nrccfi.camden.rutgers.edu/files/nrccfi-fact-sheet-2014.pdf. And, Travis, J., Western, B., & Redburn, S. (Eds.). (2014). *The growth of incarceration in the United States: Exploring causes and consequences*. Washington, DC: The National Academies Press. Retrieved from www.nap.edu/read/18613/chapter/11#274. doi: 10.17226/18613. And, Dallaire, D. H. (2007, December). Incarcerated mothers and fathers: A comparison of risks for children and families. *Family Relations, 56*(5), 440–453. Retrieved from http://onlinelibrary.wiley.com/doi/10.1111/j.1741-3729.2007.00472.x/abstract

21. Child Trends' analysis of the 2011–12 National Survey of Children's Health for the Annie E. Casey Foundation.

22. Ella Baker Center for Human Rights. (2015, September). *Who pays? The true cost of incarceration on families*. Oakland, CA: Author. Retrieved from http://ellabakercenter.org/who-pays-the-true-cost-of-incarceration-on-families. And, Travis, J., Western, B., & Redburn, S. (Eds.). (2014), p. 267. And, Arditti, J. A. (2005). Families and incarceration: An ecological approach. *Families in Society: The Journal of Contemporary Social Services, 86*(2), 251–260. Retrieved from www.convictcriminology.org/pdf/arditti/e-FamiliesIncarceration.pdf. And, Hairston, C. F. (1998, September/October). The forgotten parent: Understanding the forces that influence incarcerated fathers' relationships with their children. *Child Welfare, 77*(5), 617–639. Retrieved from www.ncbi.nlm.nih.gov/pubmed/9744076

23. Johnson, R. C. (2009). Ever-increasing levels of parental incarceration and the consequences for children. In S. Raphael & M. Stoll (Eds.), *Do prisons make us safer? The benefits and costs of the prison boom* (pp. 177–206). New York, NY: Russell Sage Foundation. And, The Pew Charitable Trusts. (2010). *Collateral costs: Incarceration's effect on economic mobility*. Washington, DC: Author. Retrieved from www.pewtrusts.org/~/media/legacy/uploadedfiles/pcs_assets/2010/collateralcosts1pdf.pdf

24. The Annie E. Casey Foundation. (2012). *Stepping up for kids: What government and communities should do to support kinship families* (KIDS COUNT Policy Report). Baltimore, MD: Author. Retrieved from www.aecf.org/resources/stepping-up-for-kids

25. Travis, J., Western, B., & Redburn, S. (Eds.). (2014), pp. 267–268. And, Geller, A., Garfinkel, I., Cooper, C. E., & Mincy, R. B. (2009, December 1).

26. Lynch, J. P., & Sabol, W. J. (2004, March). Assessing the effects of mass incarceration on informal social control in communities. *Criminology & Public Policy, 3*(2), 267–294. And, Schwartz-Soicher, O., Geller, A., & Garfinkel, I. (2011, September).

27. Child Trends' analysis of the 2011–12 National Survey of Children's Health for the Annie E. Casey Foundation.

28. Geller, A., Garfinkel, I., Cooper, C. E., & Mincy, R. B. (2009, December 1).

29. Ella Baker Center for Human Rights. (2015, September), p. 30.

30. Geller, A., Garfinkel, I., Cooper, C. E., & Mincy, R. B. (2009, December 1). And, Travis, J., Western, B., & Redburn, S. (Eds.). (2014), p. 274.

31. Princeton University. (2013, March). *Paternal incarceration and child homelessness* (Fragile Families Research Brief, No. 48). Retrieved from http://fragilefamilies.princeton.edu/sites/fragilefamilies/files/researchbrief48.pdf

32. Wildeman, C. (2014, January). Parental incarceration, child homelessness, and the invisible consequences of mass imprisonment. *The ANNALS of the American Academy of Political and Social Science, 651*(1), 74–96. Retrieved from http://ann.sagepub.com/content/651/1/74.abstract

33. Geller, A., Garfinkel, I., Cooper, C. E., & Mincy, R. B. (2009, December 1).

34. Murphey, D., & Cooper, P. M. (2015, October). And, Sacks, V., Murphey, D., & Moore, K. (2014, July). *Adverse childhood experiences: National and state-level prevalence* (Research Brief, Publication No. 2014-28). Washington, DC: Child Trends. Retrieved from www.childtrends.org/wp-content/uploads/2014/07/Brief-adverse-childhood-experiences_FINAL.pdf

35. The Annie E. Casey Foundation. (2013). *The first eight years: Giving kids a foundation for lifetime success* (KIDS COUNT Policy Report). Baltimore, MD: Author. Retrieved from www.aecf.org/resources/the-first-eight-years-giving-kids-a-foundation-for-lifetime-success

36. Dallaire, D. H. (2007, December). And, Dallaire D. H. (2007, January/February). Children with incarcerated mothers: Developmental outcomes, special challenges, and recommendations. *Journal of Applied Developmental Psychology, 28*(1), 15–24.

37. Wildeman, C. (2014, September). *Parental incarceration and child wellbeing: An annotated bibliography*. Boston, MA: The Sills Family Foundation. Retrieved from http://johnjayresearch.org/pri/files/2012/03/Annotated-bib-with-coverpage_WEB-version.pdf. And, Wildeman, C., & Western, B. (2010). And, Travis, J., Western, B., & Redburn, S. (Eds.). (2014), pp. 270–273. And, Federal Interagency Working Group for Children of Incarcerated Parents. (2013, June). *Promoting social and emotional well-being for children of incarcerated parents*. Washington, DC: Author. Retrieved from https://csgjusticecenter.org/wp-content/uploads/2013/06/Promoting-Social-and-Emotional-Well-Being-for-Children-of-Incarcerated-Parents.pdf

38. Dallaire, D. H. (2007, January/February).

39. Hairston, C. F. (2007, October). And, Dallaire, D. H., Ciccone, A., & Wilson, L. C. (2010). Teachers' experiences with and expectations of children with incarcerated parents. *Journal of Applied Developmental Psychology, 31*(4), 281–290. And, The Osborne Association. (2012, May). *Fact sheet: Parental incarceration's impact on children's health*. Bronx, NY: Author. Retrieved from www.osborneny.org/images/uploads/printMedia/Parental%20Incarceration's%20Impact%20on%20Children's%20Health%20Fact%20Sheet_Osborne.pdf

40. Murphey, D., & Cooper, P. M. (2015, October).

41. Travis, J., Western, B., & Redburn, S. (Eds.). (2014), pp. 267–268. And, The Annie E. Casey Foundation. (2014). *Creating opportunity for families: A two-generation approach* (KIDS COUNT Policy Report). Baltimore, MD: Author. Retrieved from www.aecf.org/resources/creating-opportunity-for-families

42. Schwartz-Soicher, O., Geller, A., & Garfinkel, I. (2011, September). And, Travis, J., Western, B., & Redburn, S. (Eds.). (2014).

43. Duncan, G. J., Magnuson, K., & Votruba-Drzal, E. (2014, Spring). Boosting family income to promote child development. *The Future of Children, 24*(1), 99–120. Retrieved from www.ncbi.nlm.nih.gov/pubmed/25518705. And, Turner, M. A., & Rawlings, L. A. (2005, July 29). *Overcoming concentrated poverty and isolation* (Executive Summary). Washington, DC: Urban Institute. Retrieved from www.urban.org/research/publication/overcoming-concentrated-poverty-and-isolation-executive-summary

44. Clear, T. R. (2007, July). *Imprisoning communities: How mass incarceration makes disadvantaged neighborhoods worse* (Studies in Crime and Public Policy). Oxford, England: Oxford University Press.

45. DeFina, R. H., & Hannon, L. (2009, February 23).

46. Mitchell, M., & Leachman, M. (2014, October 28). *Changing priorities: State criminal justice reforms and investments in education*. Washington, DC: Center on Budget and Policy Priorities. Retrieved from www.cbpp.org/research/changing-priorities-state-criminal-justice-reforms-and-investments-in-education

47. Travis, J., Western, B., & Redburn, S. (Eds.). (2014), p. 289. And, Clear, T. R. (2007, July).

48. Hatzenbuehler, M. L., Keyes, K., Hamilton, A., Uddin, M., & Galea, S. (2015). The collateral damage of mass incarceration: Risk of psychiatric morbidity among nonincarcerated residents of high-incarceration neighborhoods. *American Journal of Public Health, 105*(1), 138–143. Retrieved from www.ncbi.nlm.nih.gov/pubmed/25393200

49. Mitchell, M., & Leachman, M. (2014, October 28). And, Clear, T. R. (2008). And, Travis, J., Western, B., & Redburn, S. (Eds.). (2014), p. 289.

50. Coley, R. J., & Barton, P. E. (2006). *Locked up and locked out: An educational perspective on the U.S. prison population*. Princeton, NJ: Educational Testing Service. Retrieved from www.ets.org/Media/Research/pdf/PIC-LOCKEDUP.pdf. And, Geller, A., Garfinkel, I., Cooper, C. E., & Mincy, R. B. (2009, December 1).

51. Vallas, R., Boteach, M., West, R., & Odum, J. (2015, December 10). *Removing barriers to opportunity for parents with criminal records and their children: A two-generation approach*. Washington, DC: Center for American Progress. Retrieved from www.americanprogress.org/issues/criminal-justice/report/2015/12/10/126902/removing-barriers-to-opportunity-for-parents-with-criminal-records-and-their-children

52. Vallas, R., Boteach, M., West, R., & Odum, J. (2015, December 10). And, Geller, A., Garfinkel, I., Cooper, C. E., & Mincy, R. B. (2009, December 1). And, The Pew Charitable Trusts. (2010). And, Wildeman, C., & Western, B. (2010).

53. The Pew Charitable Trusts. (2010), p. 4.

54. Schwartz-Soicher, O., Geller, A., & Garfinkel, I. (2011, September).

55. Legal Action Center. (2014, July). *National blueprint for reentry: Equal opportunity housing for people with criminal histories* (2nd ed.). New York, NY: Author. Retrieved from http://lac.org/wp-content/uploads/2014/07/Reentry-Blueprint-Housing-Final-2014-08-14.pdf

56. La Vigne, N. G., Bieler, S., Cramer, L., Ho, H., Kotonias, C., Mayer, D., McClure, D., Pacifici, L., Parks, E., Peterson, B., & Samuels, J. (2014, January). *Justice reinvestment initiative: State assessment report*. Washington, DC: Urban Institute. Retrieved from www.urban.org/research/publication/justice-reinvestment-initiative-state-assessment-report

57. The Annie E. Casey Foundation. (2013, February 5). *Reducing youth incarceration in the United States* (A KIDS COUNT Data Snapshot). Baltimore, MD: Author. Retrieved from www.aecf.org/resources/reducing-youth-incarceration-in-the-united-states

58. Wagner, P., & Rabuy, B. (2016, March 14). *Mass incarceration: The whole pie*. Northampton, MA: Prison Policy Initiative. Retrieved from www.prisonpolicy.org/reports/pie2016.html

59. La Vigne, N. G., Davies, E., & Brazzell, D. (2008, February 12). And, Shanahan, R., & Agudelo, S. V. (2012, September/October). The family and recidivism. *AMERICANJails*, 17–24. Retrieved from www.vera.org/files/the-family-and-recidivism.pdf. And, The Osborne Association. (2012, May).

60. For more on the Children's Bill of Rights, visit www.sfcipp.org

61. State of Hawaii, Senate, 24th Legislature. (2007). *A bill for an act relating to a comprehensive offender reentry system*. Retrieved from www.capitol.hawaii.gov/session2007/bills/Act8_SB932.pdf

62. For more information on FamilyWorks, visit www.osborneny.org/programs.cfm?programID=11

63. Economic Development Research Group. (2012, December). *Assessing the impact of the InsideOut Dad® program on Newark Community Education Center residents*. Newark, NJ: Rutgers University, School of Public Affairs and Administration. Retrieved from http://cdn2.hubspot.net/hub/135704/file-561437088-pdf/Research_Eval_Files/368_IoDEvalRpt_NREPP_120712.pdf. And, for more information on the InsideOut Dad program, visit www.fatherhood.org/evidence-based-programs

64. Bandy, T., Andrews, K. M., & Moore, K. A. (2012, February). *Disadvantaged families and child outcomes: The importance of emotional support for mothers* (Research-to-Results Brief, Publication No. 2012–05). Washington, DC: Child Trends. Retrieved from www.childtrends.org/wp-content/uploads/2012/02/Child_Trends-2012_03_21_RB_MaternalSupport.pdf. And, Gay, K. D. (2005, September/October). The Circle of Parents® program: Increasing social support for parents and caregivers. *North Carolina Medical Journal, 66*(5), 386–388. Retrieved from http://nciom.org/wp-content/uploads/NCMJ/sept-oct-05/Gay.pdf. And, The Annie E. Casey Foundation. (2013).

65. For more information on the National Family Caregiver Support Program, visit www.aoa.acl.gov/AoA_Programs/HCLTC/Caregiver. And, Generations United. (2015). *The state of grandfamilies in America*. Washington, DC: Author. Retrieved from www.gu.org/LinkClick.aspx?fileticket=nv03BXVlGAI%3d&tabid=157&mid=606. And, for more information on Tennessee's Relative Caregiver Program, visit www.kidcentraltn.com/article/relative-caregiver-program

66. The Pew Charitable Trusts. (2010).

67. Davis, L. M., Bozick, R., Steele, J. L., Saunders, J., & Miles, J. N. V. (2013). *Evaluating the effectiveness of correctional education: A meta-analysis of programs that provide education to incarcerated adults*. Santa Monica, CA: Rand Corporation. Retrieved from www.rand.org/pubs/research_reports/RR266.html

68. The Pew Charitable Trusts. (2010). And, Davis, L. M., Bozick, R., Steele, J. L., Saunders, J., & Miles, J. N. V. (2013).

69. Davis, L. M., Bozick, R., Steele, J. L., Saunders, J., & Miles, J. N. V. (2013).

70. National Employment Law Project. (2016, March). *Research supports fair chance policies* (Fact Sheet). New York, NY: Author. Retrieved from www.nelp.org/content/uploads/Fair-Chance-Ban-the-Box-Research.pdf

71. Kane, M. (2014, November 14). First-of-its-kind technology training program debuts at San Quentin State Prison. *Inside CDCR*. Sacramento, CA: California Department of Corrections and Rehabilitation. Retrieved from www.insidecdcr.ca.gov/2014/11/first-of-its-kind-technology-training-program-debuts-at-san-quentin-state-prison. And, for more information on the Roots to Re-Entry program, visit http://phsonline.org/programs/roots-to-re-entry

72. Rodriguez, M. N., & Avery, B. (2016, March 1). *Ban the box: U.S. cities, counties, and states adopt fair hiring policies* (Toolkit). New York, NY: National Employment Law Project. Retrieved from www.nelp.org/publication/ban-the-box-fair-chance-hiring-state-and-local-guide. And, Minnesota Department of Human Rights. (n.d.). *Ban the box FAQ for private employers*. St. Paul, MN: Author. Retrieved from http://mn.gov/mdhr/employers/banbox_faq_privemp.html. And, Atkinson, D. V., & Lockwood, K. (2014, October). *The benefits of ban the box: A case study of Durham, NC*. Durham, NC: The Southern Coalition for Social Justice. Retrieved from www.southerncoalition.org/wp-content/uploads/2014/10/BantheBox_WhitePaper-2.pdf

73. Duran, L., Plotkin, M., Potter, P., & Rosen, H. (2013, September). *Integrated reentry and employment strategies: Reducing recidivism and promoting job readiness*. New York, NY: Council of State Governments Justice Center. Retrieved from https://csgjusticecenter.org/wp-content/uploads/2013/09/Final.Reentry-and-Employment.pp_.pdf

74. The Sentencing Project. (2013). *A lifetime of punishment: The impact of the felony drug ban on welfare benefits*. Washington, DC: Author. Retrieved from www.sentencingproject.org/doc/publications/cc_A%20Lifetime%20of%20Punishment.pdf

75. Office of Child Support Enforcement, Administration for Children & Families, U.S. Department of Health and Human Services. (2012, June). *Realistic child support orders for incarcerated parents* (Child Support Fact Sheet Series, No. 4). Retrieved from www.acf.hhs.gov/sites/default/files/ocse/realistic_child_support_orders_for_incarcerated_parents.pdf

76. The Annie E. Casey Foundation. (2012, February 1). *Children living in America's high-poverty communities* (KIDS COUNT Data Snapshot on High-Poverty Communities). Baltimore, MD: Author. Retrieved from www.aecf.org/resources/data-snapshot-on-high-poverty-communities

77. Legal Action Center. (2014, July).

78. For more information about the Oregon and Newark, New Jersey, policies, visit www.osbar.org/public/legalinfo/1248_HousingDiscrimination.htm and https://newark.legistar.com/LegislationDetail.aspx?ID=1159554&GUID=6E9D1D83-C8D7-4671-931FEE7C8B2F33FD&FullText=1

79. For more information about the pilot program to provide housing to formerly incarcerated people in Los Angeles, visit http://housing.anewwayoflife.org/about-the-program

80. Kleiman, N., Getsinger, L., Pindus, N., & Poethig, E. (2015, September). *Striking a (local) grand bargain: How cities and anchor institutions can work together to drive growth and prosperity*. Washington, DC: National Resource Network. Retrieved from www.nationalresourcenetwork.org/en/Document/306220/Striking_a_Local_Grand_Bargain. And, The Democracy Collaborative at the University of Maryland. (2013, August 10). *Achieving the anchor promise: Improving outcomes for low-income children, families and communities*. Baltimore, MD: The Annie E. Casey Foundation. Retrieved from www.aecf.org/resources/achieving-the-anchor-promise

## ACKNOWLEDGMENTS

The Foundation thanks the many staff members who contributed to this KIDS COUNT policy report, as well as Child Trends and the Justice Mapping Center for providing data analysis for this publication.

Permission to copy, disseminate or otherwise use information from this report is granted. To learn more, visit www.aecf.org/copyright.

Designed by KINETIK
www.kinetikcom.com

Photography © Jason Miczek, Cynthia Sambro-Rier, Rebecca Drobis, Imagesbybarbara, Edward Lara and YazolinoGirl

Printed and bound in the United States of America on recycled paper using soy-based inks.

KIDS COUNT® is a registered trademark of the Annie E. Casey Foundation.

© 2016 The Annie E. Casey Foundation






**@aecfnews**
**@aecfkidscount**

**701 ST. PAUL STREET**
**BALTIMORE, MD 21202**
**410.547.6600**
**WWW.AECF.ORG**






THE ANNIE E. CASEY FOUNDATION