UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

\- v. -

SARAH VALERIO PUJOLS,

Defendant.

24 Cr. 442 (NRB)

# GOVERNMENT'S SENTENCING MEMORANDUM

DANIELLE SASSOON
United States Attorney for the
Southern District of New York
Attorney for the United States of America

Benjamin A. Gianforti
Assistant United States Attorney
-Of Counsel-

## Table of Contents


I. Background ........ 2

A. Offense Conduct ........ 2

1. KCM Status and Money Transmission Laws ........ 2

2. CW-1's MLO ........ 3

B. Procedural History ........ 5

C. The Sentencing Guidelines ........ 6

D. Charlie Hernandez's Sentencing ........ 7

II. Argument ........ 8

A. The Governing Legal Framework ........ 8

B. The Court Should Impose a Sentence of at least 3 Months' Imprisonment ........ 11

1. The Nature and Seriousness of the Offense, and the Need to Provide Just Punishment ........ 11

2. The Need to Promote Respect for the Law and to Afford Adequate Deterrence ........ 13

3. The History and Characteristics of the Defendant and the Need to Avoid Unwarranted Sentencing Disparities ........ 14

III. Conclusion ........ 15

For a period of approximately 5 years, the defendant, a former flight attendant, moonlighted as a money mule for an international money laundering operation ("MLO") that funneled drug money from New York City to the Dominican Republic. As a flight attendant for Jet Blue Airlines ("Jet Blue"), the defendant was the perfect mule because she had "Known Crewmember" ("KCM") status with the Transportation Security Administration ("TSA"), which allowed her to slip through airport security in the dedicated KCM lane at JFK International Airport ("JFK"), or any U.S. airport with a KCM lane, with little to no scrutiny. In exchange for a few percentage points on each money run, the defendant would smuggle bulk cash generated from local narcotics sales through airport security and then hand it off to another member of the MLO in the Dominican Republic. She did this repeatedly, apparently never stopping to consider that she was fueling the scourge that is the international drug trade. She was part of a network of flight attendants who did this for the MLO, and she only stopped when she got caught by Customs and Border Protection ("CBP") trying to smuggle over $60,000 in drug money to the Dominican Republic and lied about it.

The United States Probation Office ("Probation") calculates the sentencing Guidelines applicable to the defendant as 24 to 30 months' imprisonment, and recommends a below-Guidelines sentence of 18 months' imprisonment. The defendant asks for an even more lenient, non-custodial sentence. Though the offense conduct at issue here was very serious, the Government respectfully suggests a middle path of

a short sentence of at least 3 months' imprisonment, to be followed by 3 years' supervised release, due to the unique mitigating factors relevant to this defendant. Such a sentence would also address the need to avoid unwarranted sentencing disparities among similarly situated defendants. As discussed in more detail below, United States District Judge Ronnie Abrams recently sentenced another flight attendant charged as part of the Government's broader investigation, Charlie Hernandez, to 3 months' imprisonment.[1]

In short, a sentence of at least 3 months' imprisonment is well supported by the record and would be sufficient but not greater than necessary to serve the ends of Section 3553(a).

# I. Background

## A. Offense Conduct

### 1. KCM Status and Money Transmission Laws

Large-scale narcotics suppliers who ply their wares in the United States often end up with the problem of having a significant amount of cash on hand in the United States that they would like to have access to and spend back home. (PSR ¶ 10). Unable to reliably use traditional banks to wire this cash out of the country, for fear of detection and interdiction, drug dealers often come up with more creative ways of getting their money into their pockets. (*Id.*) One common tactic favored by drug dealers based in the Dominican Republic is to enlist flight attendants who work routes

[1] A copy of the transcript of that proceeding is attached here as Exhibit 1. References thereto use the designation "Tr.__."

between the United States and the Dominican Republic to smuggle large quantities of cash out of the country in exchange for a small percentage of the proceeds smuggled. (*Id.*). In one key respect, flight attendants make ideal money mules: they typically benefit from KCM status with the TSA, which in most cases allows them to breeze through airport security via a dedicated lane without being meaningfully searched. (*Id.*). The defendant had KCM status at all relevant times. (PSR ¶ 11).

Transmission of funds in this way, without a license to do so, is a criminal offense under federal law and the laws of the State of New York. *See* 18 U.S.C. § 1960; N.Y. Banking Law §§ 641, 650. The reason for this is simple: U.S. and New York State authorities seek to disrupt the flow of criminal proceeds just like those at issue here. Licensees are required to, among other things, report suspicious financial activity to relevant authorities as a means of aiding the detection of the movement of funds derived from criminal activity. Under federal law, a money transmitter must obtain a license from the Financial Crimes Enforcement Network, a division of the U.S. Treasury. (*See* PSR ¶ 13). Under New York law, a money transmitter must obtain a license from the New York State Department of Financial Services. (*See* PSR ¶ 12). The defendant has never held a federal or state license to operate a money transmission business. (PSR ¶ 14).

### 2. CW-1's MLO

In October 2021, the Government charged an individual ("CW-1") with money laundering and narcotics offenses in connection with CW-1's operation of the MLO into which CW-1 recruited the defendant in or about 2014. (PSR ¶ 15). CW-1 began

cooperating with law enforcement soon after being charged and helped the Government build a case against the defendant and other flight attendants that CW-1 used to move drug money from New York City to the Dominican Republic. CW-1 has moved millions of dollars for drug dealers in the Dominican Republic. These dealers are known to traffick in, among other things, fentanyl. (PSR ¶ 9). CW-1 personally sold significant quantities of oxycodone, some of which was laced with fentanyl, to undercover agents prior to being charged.

Over the course of the approximately 5 years that the defendant moonlighted as a money mule for CW-1's MLO, CW-1 estimates that the defendant smuggled at least $1.5 million in narcotics proceeds out of the United States at CW-1's direction. (PSR ¶ 16). Charlie Hernandez worked as a mule for CW-1 for approximately the same period of time, with CW-1 estimating that Hernandez smuggled at least $2.5 million in narcotics proceeds for CW-1 over those approximately five years. (PSR ¶ 15). The Government estimates that the defendant earned thousands of dollars from this side hustle, based on CW-1's estimates of the total amount of cash the defendant smuggled and the low percentage-point fee the defendant charged for this service. The defendant knew she was moving drug money. (PSR ¶ 16).

On or about December 20, 2019, CW-1 met with Charlie Hernandez in the Bronx and gave him approximately $121,215 in cash—drug money to be smuggled to the Dominican Republic. (PSR ¶ 17). The same day, Hernandez gave just over half of this amount to his friend and fellow Jet Blue flight attendant, the defendant. (PSR ¶ 17). Later that day, before boarding a Jet Blue flight to the Dominican Republic that

the defendant was scheduled to work, agents with CBP stopped her and explained the restrictions on transporting U.S. currency internationally, including the duty to declare cash being brought out of the country. (PSR ¶ 18). The defendant, who was actually in possession of over $60,000 in cash, lied to the CBP agents and reported that she was only in possession of about $1,000, which she produced for the agents' inspection. (*Id.*). When the agents searched her purse, however, they found the additional $60,000, which they confiscated. (*Id.*). At some point thereafter, the defendant told Hernandez about the stop and Hernandez relayed the information to CW-1. (*Id.*)

Jet Blue fired the defendant as a result of this incident. (*Id.*).

### B. Procedural History

On April 30, 2024, United States Magistrate Judge Sarah L. Cave issued a criminal complaint charging the defendant and Charlie Hernandez with operation of an unlicensed money transmission business, in violation of 18 U.S.C. §§ 1960 & 2; conspiracy to operate an unlicensed money transmission business, in violation of 18 U.S.C. §§ 371 & 1960; bulk cash smuggling, in violation of 31 U.S.C. §§ 5332 & 2; and entering an airport or aircraft area in violation of security requirements, in violation of 49 U.S.C. §§ 46314(a) and (b)(1). The defendant was arrested on May 7, 2024, and presented before United States Magistrate Judge Gary Stein. The defendant was bailed and has been on pretrial supervision since her arrest.

On July 23, 2024, the defendant pleaded guilty before the Court, pursuant to a plea agreement, to an information charging her with a single count of violating 18 U.S.C. §§ 1960 & 2, in connection with her involvement in CW-1's MLO.[2]

### C. The Sentencing Guidelines

Probation arrived at a different Guidelines calculation than that reflected in the plea agreement in this matter: a base offense level of 14, pursuant to U.S.S.G. §§ 2S1.1(a)(2); a six-level enhancement because the defendant knew that the laundered funds were the proceeds of narcotics activity, pursuant to U.S.S.G. § 2S1.1(b)(1); a two-level enhancement for abusing a position of trust, pursuant to U.S.S.G. § 3B1.3; a three-level deduction for acceptance of responsibility, pursuant to U.S.S.G. §§ 3E1.1(a)-(b); and a further two-level deduction under the Zero-Point Offender Guideline, pursuant to U.S.S.G. § 4C1.1(a), for a total offense level of 17. The plea agreement does not include the abuse-of-trust enhancement under U.S.S.G. § 3B1.3.[3]

---

[2] Hernandez pleaded guilty to the same offense, pursuant to a plea agreement, before Judge Abrams on July 25, 2024. *See United States v. Hernandez*, No. 24 Cr. 447 (RA). On December 20, 2024, Judge Abrams sentenced Hernandez to 3 months' imprisonment.

The Government charged three other flight attendants as part of its takedown of CW-1's money mule network: Emmanuel Torres, Jarol Fabio, and Johanna De Jesus. All three have also pleaded guilty to a Section 1960 charge, pursuant to a plea agreement. Torres is currently due to be sentenced by United States District Judge Colleen McMahon on March 5, 2025; Fabio is currently due to be sentenced by United States District Judge Arun Subramanian on February 20, 2025; and De Jesus is currently due to be sentenced by United States District Judge Edgardo Ramos on February 12, 2025. *See United States v. Torres*, No. 24 Cr. 474 (CM); *United States v. Fabio*, No. 24 Cr. 481 (AS); *United States v. De Jesus*, No. 24 Cr. 577 (ER).

[3] In preparing the PSR for the defendant, as well as the other flight attendants charged in connection with CW-1's MLO, Probation asked the Government whether it felt the abuse-of-trust enhancement was appropriate on the facts presented here.

The defendant has no criminal history and therefore is in Criminal History Category I. Accordingly, her stipulated Guidelines Range under the plea agreement is 18 to 24 months' imprisonment and her Guidelines Range according to Probation is 24 to 30 months' imprisonment. (*See* PSR ¶¶ 5, 25-40, 66).

### D. Charlie Hernandez's Sentencing

As noted above, on December 20, 2024, Judge Abrams sentenced Charlie Hernandez to 3 months' imprisonment. Judge Abrams noted that the 3553(a) factors that were most critical to her reasoning were "general deterrence and recognizing the seriousness of the crime." (Tr. 18).

---

The Government initially agreed that the enhancement would be appropriate, but, upon further consideration, no longer does. Probation included the enhancement for this defendant, but not for Charlie Hernandez.

U.S.S.G. § 3B1.3, Application Note 1, makes clear that the enhancement is principally intended for defendants who hold positions "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." The examples provided by the Guidelines Commission include those with certain duties of care, such as an attorney embezzling funds from a client for whom the attorney is acting as a legal guardian, "a bank executive's fraudulent loan scheme," or "the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk." While the enhancement may appear applicable based on the defendant's violation of the position of trust she was conferred through her KCM status, the Government's position is that a flight attendant falls closer to the bank teller/hotel clerk-end of the spectrum than the attorney/bank executive/doctor-end of the spectrum, and therefore the enhancement does not apply. The Government discussed its position with Judge Abrams at Hernandez's sentencing and, although she agreed that there had been a clear abuse of the trust, she ultimately did not apply the enhancement. *See* Tr. 4, 8-9.

With respect to the seriousness of the offense, Judge Abrams noted, among other things, that far from being an isolated "short lapse in judgment….this was five years, with the government estimating that [Hernandez] laundered approximately two and a half million dollars, even if he only received a small portion in return. And he only stopped because he saw someone else [the defendant] get arrested." (Tr. 21). Judge Abrams also focused on the fact that Hernandez had moved funds linked to the international fentanyl trade, which "cause[s] real harm to real people," noting that she had "had a number of cases since [becoming] a judge where people have died of fentanyl overdoses." (Tr. 21-22). "[T]hese organizations can't function without getting their proceeds…and you helped in that process. And, as I said, you didn't do it for a week or two weeks or even a year. You did it for five years." (Tr. 22).

With respect to the need for general deterrence, Judge Abrams noted that she thought a 3-month term of imprisonment would result in real "deterrence within this community of flight attendants and others who work in that industry." (Tr. 23; *see also* Tr. 16-17, 29).

## II. Argument

### A. The Governing Legal Framework

The Guidelines still provide strong guidance to the Court in light of *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings

by correctly calculating the applicable Guidelines range": that "should be the starting point and the initial benchmark." *Gall v. United States*, 55 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "'anchor[s]'" the district court's discretion. *Molina-Martinez v. United States*, 578 U.S. 189, 200, 204 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2087 (2013)); *see also*, *e.g.*, *United States v. Solis*, 18 F.4th 395, 405 (2d Cir. 2021) ("District courts are to use the Guidelines as a 'starting point' and then make an independent sentencing determination, taking into account the 'nature and circumstances of the offense and the history and characteristics of the defendant' and all other statutory factors.").

After that calculation, however, a sentencing judge must consider seven factors outlined in 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see* 18 U.S.C. § 3553(a)(2); "the kinds of sentences available," 18 U.S.C. § 3553(a)(3); the Guidelines range itself, *see* 18 U.S.C. § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see* 18 U.S.C. § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," 18 U.S.C. § 3553(a)(6);[4] and "the need to provide restitution to any victims," 18 U.S.C.

[4] Among the factors a sentencing court must consider in imposing sentence is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Congress adopted Section 3553(a)(6) "to eliminate unwarranted disparities nationwide." *United States v. Williams*, 524 F.3d 209, 215 (2d Cir. 2008). Because Section 3553(a)(6) was intended to address national disparities, "a district court may—but is not required to—consider sentencing disparity among co-defendants under 18 U.S.C. § 3553(a)(6)." *United States v. Johnson*, 567 F.3d 40, 54 (2d Cir. 2009) (citing *United States v. Frias*, 521 F.3d 229, 236 & n.8 (2d Cir. 2008)). By this same logic, this Court

§ 3553(a)(7). In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions,"

---

may—but is not required to—consider sentencing disparities with other defendants in this District.

*Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

### B. The Court Should Impose a Sentence of at least 3 Months' Imprisonment

A sentence of at least 3 months' imprisonment would be sufficient, but not greater than necessary, to comply with the purposes of sentencing. The Section 3553(a) factors most applicable in this case include the nature and circumstances of the offense of conviction, the seriousness of the offense, the need to provide just punishment, the need to promote respect for the law, the need to afford adequate deterrence to criminal conduct, the need to avoid unwarranted sentencing disparities among defendants, and the history and characteristics of the defendant. A balance of these factors weighs in favor of the Government's recommended sentence, and against the undue leniency the defendant seeks through her request for a non-custodial sentence.

#### 1. The Nature and Seriousness of the Offense, and the Need to Provide Just Punishment

The nature, circumstances, and seriousness of the offense and the need for just punishment warrant a term of imprisonment of at least 3 months. The international drug trade, and particularly the international trade in opioids like fentanyl and oxycodone, is a scourge in the United States. The opioid epidemic in this country has been well documented and has led to many, many destroyed lives, violence, and obscene wealth for large-scale traffickers like those who made up CW-1's client base.

The defendant was just a small part of this, but was nonetheless a vital pipeline for the money that keeps this drug trade running and profitable. She knew what this money was and she smuggled it out of the country again and again and again for approximately, not just on a handful of occasions over a short period of time. She could have found other ways to make the extra money she needed during this time in her life, but, no, she decided to go into the money muling business. Thanks to her, some drug lords in the Dominican Republic are that much richer.

What makes matters worse is that the defendant abused a position of trust bestowed upon her as a flight attendant with KCM status. The defendant knew that she could breeze through airport security at JFK with little to no scrutiny. After CW-1 approached her, she learned that this access could be monetized, which she did over and over again. Airports are in many ways the front lines of national security and law enforcement in this country. They have a unique role in helping to screen and disable potential threats and criminal activity. The defendant thumbed her nose at all of that to make a few bucks.

And what sets her apart from Charlie Hernandez, who engaged in the same conduct for approximately the same period of time, is that, when she was caught, she lied. Rather than giving up the extra $60,000 stashed in her purse when she was stopped by CBP, or offering to help the Government catch CW-1 (who was not charged or cooperating at this point), she thought she could lie her way out of it and onto the plane to deliver the money. That much better to keep her side gig going. That said, this run-in with law enforcement appears to have scared her straight.

All of these reasons support a sentence of at least 3 months' imprisonment.

### 2. The Need to Promote Respect for the Law and to Afford Adequate Deterrence

The need for the sentence to promote respect for the law and to afford adequate deterrence further supports imposition of a sentence that includes a meaningful term of imprisonment. Again, the defendant was well aware of the special access to airports that she was granted by virtue of being a flight attendant with KCM status. But she treated that access like an ATM card, demonstrating a profound disrespect for the law.

While the Government agrees in large part with the defense that the defendant has likely been sufficiently specifically deterred from doing anything like this again, there is still a need for general deterrence here. The Government's arrest of the defendant, Hernandez, and the other flight attendants was well-covered in the press and the Government hopes that U.S. airlines have started to make changes to address the risk of abuse that comes along with KCM status. But there is nonetheless a need to demonstrate that this kind of abuse comes with serious consequences, including jail time. The risk is that a slap on the wrist like home confinement will not fundamentally change the calculus for others with KCM status: if people have been slipping through the net for so long, and can easily make extra money, those with KCM status may conclude that it is more than worth the risk of facing home confinement. The calculus should be that rolling these dice could land you in jail, with no prospect of employment in the airline industry on the other side.

### 3. The History and Characteristics of the Defendant and the Need to Avoid Unwarranted Sentencing Disparities

The history and characteristics of the defendant are mitigating and weigh in favor of a term of imprisonment of at least 3 months, rather than a Guidelines range sentence or even the 18 months suggested by Probation. But they are not so uniquely mitigation as to warrant a non-custodial sentence out of sync with Judge Abrams' 3-month sentence for Charlie Hernandez.

There were mitigating considerations for Hernandez, as well, including, among other things, a long history of employment and serious medical issues. The only material distinguishing fact here is that Hernandez is childless, whereas the defendant has a young child at home. The record is clear that the defendant has a robust support network to care for her child if she is given a short custodial sentence. Especially in a case like this, where the defendants are unusually similarly situated, having a child cannot be a get-out-of-jail-free card.

## III. Conclusion

For the reasons set forth above, this Court should sentence the defendant to at least 3 months' imprisonment. Such a sentence would be sufficient, but not greater than necessary, to accomplish the goals set forth in 18 U.S.C. § 3553(a).

Dated: New York, New York
January 21, 2025

Respectfully submitted,

DANIELLE SASSOON
United States Attorney

By: ______________________________
Benjamin A. Gianforti
Assistant United States Attorney
(212) 637-2490